Not For Publication

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                        )
IN RE:                                  )    CASE NO.         06-31855 (LMW)
                                        )
  THOMAS J. CALABRESE and               )    CHAPTER          7
  KAREN E. CALABRESE,                   )
                                        )    DOC. I.D. NO.    64
           DEBTORS.                     )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**APPEARANCES**

Thomas J. Calabrese                     *Pro Se* Debtors
Karen E. Calabrese
73 Cronin Avenue
Waterbury, CT  06708


Eugene S. Melchionne, Esq.              Respondent
27 First Avenue
Waterbury, CT  06710-1167


Barbara H. Katz, Esq.                   Chapter 7 Trustee
57 Trumbull Street
New Haven, CT  06510


Holley Claiborn, Esq.                   Attorney for the United States Trustee
Office of the U.S. Trustee
The Giamo Federal Building
150 Court Street, Room 302
New Haven, CT  06510


**MEMORANDUM AND ORDER RE:  ORDER TO SHOW CAUSE AT EVIDENTIARY
HEARING WHY ATTORNEY'S FEES SHOULD NOT BE DISGORGED**


Lorraine Murphy Weil, United States Bankruptcy Judge

Before the court is that certain Order To Show Cause at Evidentiary Hearing Why Attorney's Fees Should not Be Disgorged and Order Scheduling Evidentiary Hearing on Motion To Withdraw as Counsel (Doc. I.D. No. 64, the "Show Cause Order")[1] issued in the above-captioned case. The court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and that certain Order dated September 21, 1984 of this District (Daly, C.J.).[2]

I.    **BACKGROUND**

The above-referenced debtors (the "Debtors") commenced this chapter 7 case by a petition filed on October 27, 2006. Simultaneous with that petition the Debtors filed their sworn schedules and Statement of Financial Affairs. (*See* Doc. I.D. No. 1 (collectively, the "Schedules").) The Debtors received their chapter 7 discharge on September 14, 2007. (*See* Doc. I.D. No. 45.) On August 8, 2008, the chapter 7 trustee (the "Trustee") filed a Motion To Compel (Doc. I.D. No. 54, the "Motion To Compel") the Debtors to cooperate with her in facilitating her marketing of the family home (the "Property"). On August 25, 2008, Eugene Melchionne, Esq., the Debtors' chapter 7 attorney, filed a Motion To Withdraw as Counsel (Doc. I.D. No. 58).[3] A hearing (the "First Hearing") on the Motion To Compel was held on September 10, 2008. The Debtors (*pro se*) and the Trustee appeared at the First Hearing. The Motion To Compel was granted by an order dated

---

[1] Citations herein to the docket of this chapter 7 case appear in the following form: "Doc. I.D. No. __" and references to relevant adversary proceedings appear in the following form: "A.P. Doc. I.D. No. __."

[2] That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceeding arising under Title 11, U.S.C., or arising in . . . a case under Title 11, U.S.C. . . . ."

[3] That motion was granted by an order dated September 29, 2008. (*See* Doc. I.D. No. 71.)

September 10, 2008. (See Doc. I.D. No. 66.) That order was amended by an order dated September 29, 2008. (*See* Doc. I.D. No. 70.)

At the First Hearing, Mrs. Calabrese made certain allegations about Attorney Melchionne's representation of the Debtors with respect to this case. In short, Mrs. Calabrese alleged that the Debtors had been advised by Attorney Melchionne that late-recorded mortgages on the Property (discussed below) would be avoided in the bankruptcy for the benefit of the Debtors, that Attorney Melchionne's bankruptcy counseling of the Debtors otherwise was inadequate and that the Debtors were in the process of losing their home (*i.e.,* the Property) as a result of the allegedly improvidently-filed bankruptcy petition. In order to air the matter more fully, on September 11, 2008 the court issued the Show Cause Order.[4]

The Show Cause Order came on for a hearing (the "Second Hearing") on September 22, 2008.[5] The Debtors (*pro se*), Attorney Melchionne, the Trustee and counsel for the United States Trustee all appeared at the Second Hearing.[6] Mrs. Calabrese testified for the Debtors. Theresa M. Devereux (Attorney Melchionne's paralegal) and Attorney Melchionne testified for Attorney Melchionne. Both sides introduced documents ("Exhibits") into the record.[7] At the conclusion of

---

[4] The Show Cause Order was not a signal that the court had prejudged the matter but, rather, was a "handy" procedural device to air serious allegations before the court.

[5] A transcript ("Transcript") of the Second Hearing appears in the record as Doc. I.D. No. 75.

[6] The Trustee and the United States Trustee took no position. Attorney Melchionne was permitted to hear the entire oral record of the First Hearing in order to ascertain more fully the Debtors' allegations against him.

[7] Reference to the Exhibits appear in the following form: "Debtors' Exhibit __" and "Melchionne Exhibit __."

- 3 -

the evidentiary presentations, the court heard summations by the parties and (in light of the lateness of the hour) took the matter under advisement. The matter now is ripe for decision.

For the reasons discussed below, the court has determined that Attorney Melchionne's representation of the Debtors in respect of this case far more than justified his $1,500.00 fee. Accordingly, no disgorgement of fees is warranted and the Show Cause Order will be marked off.

**II.    FACTS**

The Debtors appear to be in their early fifties. About five years ago, Mr. Calabrese was disabled as a result of a stroke. His ability to speak is very limited and appears to have other physical problems. As discussed below, Mr. Calabrese's mental capacity has been called into question. Mrs. Calabrese has had alcohol and other substance abuse and "spending" problems.

On or about January 26, 2006, the Debtors refinanced an existing mortgage or mortgages on the Property with Accredited Home Lenders, Inc. ("Accredited"). There were two mortgages: a first mortgage (the "Accredited Mortgage") securing a debt in the approximate amount of $136,000.00; and a second mortgage (the "Specialized Mortgage," collectively with the Accredited Mortgage, the "Initial Mortgages") to secure a debt in the approximate amount of $34,000.00.[8] The Debtors were not represented by counsel in respect of the Initial Mortgages and, in fact, the closing was conducted in the Debtors' home by a paralegal (presumably provided by the lender). Neither of the Initial Mortgages were recorded in the relevant land records until August 11, 2006. Sometime in March, 2006, Accredited assigned the Specialized Mortgage to Specialized Loan Servicing, Inc. ("Specialized") pursuant to an unrecorded assignment. Thereafter, the Debtors received two

---

[8]    The Specialized Mortgage may have been denominated a secured line of credit as part of an "80/20" arrangement to circumvent costs associated with private mortgage insurance.

- 4 -

mortgage invoices each month: an invoice from Accredited with respect to the Accredited Mortgage; and an invoice from Specialized with respect to the Specialized Mortgage.

Because the Debtors did not like that two-invoice arrangement (and perhaps because of more generalized financial distress), the Debtors attempted to refinance the Initial Mortgages with Nationstar Mortgage LLC fka Centex Home Equity Company LLC ("Nationstar"). That mortgage (the "Nationstar Mortgage," collectively with the Initial Mortgages, the "Mortgages") secured a debt in the original principal amount of $169,000.00. Nationstar apparently was unaware of the Specialized Mortgage (which was not of record until shortly before the closing of the Nationstar Mortgage loan), but was aware of the Accredited Mortgage (notwithstanding its delayed recordation). Accordingly, Nationstar contacted Accredited to request a "payoff figure" for the Accredited Mortgage. Accredited gave Nationstar a "payoff figure" for the Accredited Mortgage in the amount of $145,508.45, but apparently did not advise Nationstar of the existence of the Specialized Mortgage.[9] On or about August 17, 2006, the Nationstar Mortgage transaction closed. The Debtors again were not represented by an attorney at that closing which was conducted at the Debtors' home by a paralegal (presumably provided by the lender). The Nationstar Mortgage was not recorded until November 7, 2006 (*i.e.,* postpetition).

As a result of the Nationstar Mortgage closing, the Accredited Mortgage was paid off and excess loan proceeds were paid to the Debtors who spent them to pay debts and some legitimate living expenses (perhaps among other things). Immediately after the Nationstar Mortgage closing, the Debtors thought that they had paid off the Specialized Mortgage; they had not. Immediately

---

[9] Nationstar's inquiry appears to have precipitated the recording of the Initial Mortgages.

after the closing, Nationstar presumably thought that it had a first mortgage; in fact, the Specialized Mortgage still was extant and was recorded prior to the recording of the Nationstar Mortgage (*i.e.,* the Nationstar Mortgage was a junior mortgage behind the Specialized Mortgage). The Debtors never made any payments on the Nationstar Mortgage. As of the Second Hearing, Property taxes were delinquent, tax foreclosure proceedings were imminent, and the Trustee had to purchase insurance for the Property because the Debtors had not. As of the Second Hearing, the Debtors had not made a mortgage or use and occupancy payment in respect of the Property in over two years.

The Debtors first contacted Attorney Melchionne in August, 2006 because they had become aware of the still extant Specialized Mortgage and also because they were in general financial distress. Attorney Melchionne's representation of the Debtors will be discussed in more detail below. As noted above, this case was commenced on October 27, 2006. In their sworn Schedules, the Debtors listed the Property as mortgage-free and claimed a current value of $150,000.00 in the Property. (*See* Doc. I.D. No. 1 (Schedules A and D).) The Debtors claimed the Connecticut homestead exemption in respect of the Property in the aggregate amount of $150,000.00. (*See id.* (Schedule C).) In their Schedule F, the Debtors listed disputed general unsecured claims to Nationstar (*i.e.,* Centex Home Equity) and Specialized, each such claim in the amount of $169,100.00. (*See id.* (Schedule F).) Attorney Melchionne's agreed upon fee (the "Fee") for the chapter 7 case was $1,500; it was paid in its entirety prepetition. (*See id.* (Disclosure of Compensation of Attorney for Debtor).) Nationstar timely filed a proof of claim in this case to state a secured claim in the amount of $171,436.64. (*See* Proof of Claim No. 11.) Specialized timely filed a proof of claim in this case to state a secured claim in the amount of $36,242.00. (*See* Proof of Claim No. 12.)

The Trustee applied to retain Attorney Melchionne to represent her in avoidance proceedings against Nationstar, Accredited and Specialized and that motion was granted by order dated September 20, 2007. (*See* Doc. I.D. No. 37.)  On July 3, 2007, the Trustee (by Attorney Melchionne) commenced adversary proceedings seeking avoidance as preferential transfers and other relief against Accredited with respect to the Initial Mortgages (A.P. No. 07-3073 and 3074), Specialized with respect to the Initial Mortgages (A.P. No. 07-3074), and Nationstar with respect to the Nationstar Mortgage (A.P. No. 07-3075).  The proceedings against Nationstar are closed and resulted in a stipulation by which Nationstar agreed to release the recording of the Nationstar Mortgage and to amend the proof of claim filed by it to assert an unsecured (rather than secured) claim.  (*See* A.P. Doc. I.D. No. 07-3075 Doc. I.D. No. 29 (Exhibit).)  Summary judgment proceedings are pending in A.P. No. 07-3073.  Summary judgment proceedings (on the Trustee's motion) also are pending in A.P. No. 07-3074.[10]  As a matter of law, to the extent that the Trustee obtains an avoidance of any Mortgage in the Adversary Proceedings, that Mortgage will be preserved for the benefit of the Trustee (*i.e.,* the estate) and the Trustee will step into the shoes of the relevant mortgagee as against the Debtors.  *See* 11 U.S.C. § 551.

### III. <u>TESTIMONY AT THE SECOND HEARING</u>

The Debtors' most serious allegation is that Attorney Melchionne told them that the Mortgages would be avoided in bankruptcy *for their benefit* and that they would emerge from bankruptcy with the Property Mortgage-free.  Mrs. Calabrese testified that when Attorney Melchionne discovered the late recorded Mortgages, he told them: "[T]his is like hitting Power Ball.

---

[10]  Accredited has appeared in that proceeding, but Specialized has not.  The three adversary proceedings hereafter referred to collectively as the "Adversary Proceedings."

This is a chance of a lifetime. You will . . . live the rest of your lives without a mortgage." (Transcript at 19: 11-14 (testimony of Mrs. Calabrese).) Mrs. Calabrese also testified that the Debtors received a letter from Attorney Melchionne reiterating that they would live Mortgage-free.[11] Mrs. Calabrese testified that the Debtors would not have commenced this case had they not believed so. Mrs. Calabrese also testified that the Schedules were incorrect, most notably in that Ms. Devereux told them that they could "pick and choose" creditors and, as a result, the Debtors omitted three prepetition creditors that the Debtors preferred not to notify of the bankruptcy. Finally, Mrs. Calabrese testified that she had no idea that the Trustee could acquire title to (*i.e.,* sell) the Property and Attorney Melchionne had not advised them adequately as to the role of a chapter 7 trustee. Mrs. Calabrese further testified that, but for the bankruptcy, she would bring delinquent taxes current by obtaining a home equity loan.

Attorney Melchionne testified as follows. He flatly denied that he ever made the alleged "Power Ball" remark to the Debtors or that he otherwise suggested that avoidance would be for their benefit. Attorney Melchionne conceded in his testimony that he did hold out the possibility to the Debtors that they ultimately could own the Property Mortgage-free, but not as a result of the Trustee's lien avoidance. Rather, Attorney Melchionne testified that he believed that, even in the Trustee's hands, there were serious issues (the "Issues") respecting the Mortgages (including but not necessarily limited to) under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, and the Real

---

[11]   In fact, the letter stated:

Had you done what was required of you, there was every expectation that you would end up with the home without a mortgage and only be required to pay the taxes and insurance from year to year.

Debtors' Exhibit 1 (hereafter, "Exhibit 1").

Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*, and a possible lack of capacity (Mr. Calabrese's) defense. Attorney Melchionne testified that after payment of reasonable living expenses (but no payment of Property expenses or prepetition debt), the Debtors had about a $2,000.00 surplus of income over expenses each month. Attorney Melchionne testified that he advised the Debtors to use that surplus to become and stay current on Property taxes and to keep the Property insured; any excess funds could be banked to build up a "settlement fund" (in the projected approximate amount of $36,000.00). Attorney Melchionne further testified that he anticipated asserting the Issues defensively against the Trustee when she sought to enforce the Mortgages and that he had a reasonable expectation that he could persuade the Trustee to release the Mortgages for consideration roughly equal to the "settlement fund."[12] In that way, Attorney Melchionne testified, the Debtors would emerge from bankruptcy with the Property Mortgage-free and that was the scenario that Exhibit 1 contemplated.

Ms. Devereux testified that the Schedules were as complete as the information provided her by the Debtors permitted. Ms. Devereux denied that she told the Debtors that they could "pick and choose" creditors to be listed in the bankruptcy and further testified that she had told the Debtors that they could not so pick and choose. Attorney Melchionne testified that he had fully advised the Debtors as to the chapter 7 process and that his office had put between forty and fifty hours into just meeting with the Debtors "trying to get them to the point where they could survive every month." (Transcript at 140:21-23 (Closing Statement of Attorney Melchionne).). Attorney Melchionne and Ms. Devereux further testified that much of that time was spent on budget counseling with the

---

[12] The court expresses no opinion as to whether Attorney Melchionne could have asserted the Issues against the Trustee given his representation of her in the Adversary Proceedings.

Debtors with a view towards keeping taxes and insurance current and funding the "settlement fund." Finally, Attorney Melchionne testified that, if the Property taxes and insurance were current (and he was still the Debtors' lawyer), the Debtors would not be exposed to a potential sale of their home by the Trustee.

## IV.    ANALYSIS

### A.    Standards

Bankruptcy Code § 329 provides as follows:

> (a)  Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.
> (b)  If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to–
> > (1)  the estate, if the property transferred–
> > > (A)  would have been property of the estate; or . . .
> > (2)  the entity that made such payment.

11 U.S.C.A. § 329 (West 2008).  It is ultimately for the court to decide whether or not the compensation is reasonable under Section 329(b).  "What constitutes reasonableness is a question of fact to be determined by the particular circumstances of each case.  The requested compensation may be reduced if the court finds that the work done was excessive or of poor quality."  3 Alan N. Resnick and Henry J. Sommer, *Collier on Bankruptcy* ¶ 329.04[1], at 329-15 (15th ed. rev. 2006). In determining the reasonableness of a given fee, the court should consider the competence of the performance and the nature of the services.  *In re Grant*, 14 B.R. 567, 569 (Bankr. S.D.N.Y. 1981). Other relevant considerations include "the attorney's legal experience and the failure or success in

accomplishing [the] desired result on the debtor's behalf." *Cohn v. U.S. Trustee (In re Ostas)*, 158 B.R. 312, 323 (N.D.N.Y. 1993) (citation and internal quotation marks omitted).

   **B.    Application of Law To Facts**

The court finds the testimony for Attorney Melchionne more persuasive than the testimony of Mrs. Calabrese on all points. In particular, the court is persuaded that Attorney Melchionne did not advise the Debtors that Mortgage avoidance would be for their benefit and that he never made the "Power Ball" allusion in that regard. The court is satisfied with Attorney Melchionne's explanation of Exhibit 1. The court is satisfied that the Debtors were not advised that they could "pick and choose" creditors. The court is satisfied that the Debtors were advised adequately as to the chapter 7 process and its implications.

With respect to the treatment of the Mortgages and the claims of Specialized and Nationstar in the Schedules, the approach taken by Attorney Melchionne might not have been the approach this court might have taken (*i.e.,* this court might have considered listing the Mortgages as disputed secured claims or even unsecured claims but, in either case, with an explanatory footnote as to their allegedly avoidable status). However, the Trustee appears not to have been misled by Mr. Melchionne's approach to the Schedules (or was enlightened at the Section 341 meeting of creditors) and the court finds that the Debtors reasonably could not have been misled either.[13]

Mrs. Calabrese complained that the debt of Specialized was grossly inflated in the Schedules (*i.e.,* was stated in the same amount as the Nationstar debt). Given the convoluted nature of the Mortgage transactions, Attorney Melchionne is to be pardoned for that misstatement. In any event,

---

   [13]    As Mrs. Calabrese noted at the Second Hearing, "if something seems too good to be true, it probably is." (*See* Transcript at 11.)

the Specialized debt was listed as "disputed." Accordingly, the listing of the Specialized debt in an inflated amount did not prejudice the Debtors. Given the Property's current state of title, the court is not persuaded that the Debtors could further encumber it to finance payment of delinquent taxes. The court further is persuaded that the Debtors are in the situation that they are in (*i.e.,* facing a potential sale of the Property by the Trustee) because they failed to follow a budget in a responsible manner and thus failed to keep the Property taxes and insurance current.

## V. CONCLUSION

For the reasons discussed above, the court finds that the value of Attorney Melchionne's services exceeds the amount of the Fee. Accordingly, there shall be no disgorgement and the Show Cause Order shall be marked "off."

It is **SO ORDERED.**

Dated: November 26, 2008                                        BY THE COURT

*Lorraine Murphy Weil*
**Lorraine Murphy Weil**
**United States Bankruptcy Judge**